IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RUBEL ROYBAL,

        Plaintiff,

vs.                                                                                  No. CIV 08-0181 JB/LFG

CITY OF ALBUQUERQUE, YVONNE MARTINEZ,
DENNIS TAFOYA, GEORGE TRUJILLO,
PETER DWYER, LORRAINE SADLER-LOPEZ,
City of Albuquerque Police Officers,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Partial Summary

Judgment and Memorandum of Law in Support, filed September 17, 2008 (Doc. 31). The Court

held a hearing on January 5, 2009. The primary issues are: (i) whether the order of the Honorable

William P. "Chip" Johnson, United States District Judge, granting Mary Roybal's motion for

summary judgment in Mary Roybal v. City of Albuquerque, No. CIV 05-1326 WJ/KBM, estops the

Defendants from relitigating Plaintiff Rubel Roybal's claim for unlawful entry; and (ii) if Judge

Johnson's order does not bar relitigation, whether the undisputed facts show that the individual

Defendants performed an unlawful search of Mr. Roybal's house. Because Mr. Roybal could have

easily joined Mrs. Roybal's lawsuit, the Court will not now permit Mr. Roybal to take advantage

of the outcome of that earlier case to preclude the Defendants from relitigating the Fourth

Amendment issues here. The result, however, is ultimately the same, because the Court agrees with

Judge Johnson's assessment in Mary Roybal v. City of Albuquerque that the undisputed facts show

that the individual Defendants unlawfully entered the Roybals' garage and backyard in violation of

the Fourth Amendment.  Based upon Mr. Roybal's seeking damages limited to the entry into the home, the Court will not address whether the Defendants moving further into the house, from the garage and from the backyard respectively, is separate grounds for liability.  The Court's grant of summary judgment will not extend to Defendant George Trujillo, however, because he was not served with process until after this motion was filed and after the hearing on the motion.

## **FACTUAL BACKGROUND**

This case arises out of Albuquerque Police Department ("APD") officers' warrantless search of Mr. Roybal's home and his subsequent arrest on charges of violating municipal ordinances on excessive noise and premises liability.  On the night of April 8, 2005, members of the APD "Party Patrol" responded to a complaint of excessive noise coming from Mr. Roybal's home.[1]  The officers entered the home, and later arrested Mr. and Mrs. Roybal.  Mr. Roybal contends that the officers unlawfully invaded his home and arrested him in retaliation for insulting the officers.  In the Defendants' version of events, Mr. and Mrs. Roybal consented to the search of their home and their arrests were legitimate arrests based on probable cause.

Although the parties are at odds over the interpretation of the events that took place the night of April 8, 2005, the basic outline of events, as well as many of the facts, are undisputed.  On April 8, 2005, Mr. Roybal was relaxing in his garage -- which had been converted into a recreation room with a pool table, other games, and a bar area -- along with several friends and family members.  See Motion ¶¶ 4, 6, at 3-4.  Late that evening, APD officers responded to a neighbor's anonymous complaint about the noise coming from Mr. Roybal's home and about cars blocking the cul-de-sac. See id. ¶ 7, at 4; Exhibit B to Response, Incident Report at 1 (Doc. 34-2).  All the Defendants arrived

---

[1] The Party Patrol is a special unit of the APD that investigates complaints of excessive noise and underage drinking.

at Mr. Roybal's home at the same time, although another officer may have arrived later.  See Motion ¶ 8, at 4; Response ¶ 8, at 3.

The garage door was partially raised, and Mrs. Roybal saw police boots through the opening. See Motion ¶¶ 9-10, at 4.  Someone -- the parties dispute whether it was the Roybals' friend, Casey Quiroz, or someone else -- opened the garage door.  See id. ¶ 10, at 4.  Mr. Roybal maintains that Defendants Yvonne Martinez, George Trujillo, and Lorraine Lopez-Sadler,[2] as well as non-Defendant APD officer Burchell, immediately entered the garage when the door was opened. See Motion ¶ 11, at 4.  The Defendants contend that they spoke with Mr. and Mrs. Roybal, who identified themselves as the homeowners, and walked into the garage during the course of the conversation.  See Exhibit D to Response, Deposition of George R. Trujillo at 18:11-16 (taken October 3, 2006)("Trujillo Depo.")(Doc. 34-2); Exhibit E to Response, Deposition of Yvonne Martinez at 15:8-11 (taken October 3, 2006)("Martinez Depo.")(Doc. 34-2).

The Defendants admit there were no exigent circumstances for the entry, although the Defendants assert they were relying on consent.  See Motion ¶ 12, at 4; Response ¶ 12, at 4.  Mr. Roybal contends that no consent was given.  The Defendants point to two depositions as showing that the officers had consent to enter.  The first is Trujillo's deposition:

> A. . . .  I didn't immediately walk in.  I mean, there was some conversation, you know, when I asked.  And then as -- of course, they were at the far end of the garage. I wasn't going to sit there and holler from one end to the other.  So after, you know, they identified themselves as being the owners, I walked inside and we having a conversation inside the garage area.
>
> Q. Did you ask them if you could go in?
>
> A. No.

---

[2] Various documents refer to Lopez-Sadler as either "Lopez-Sadler" or "Sadler-Lopez." "Lopez-Sadler" seems more prevalent, so the Court will use that form.

Q. Did they invite you in?

A. Did they say, "Come on in"?

Q. Yeah.

A. No.

Trujillo Depo. at 19:2-15 (emphasis added).  As Mr. Roybal points out, the "yeah" is counsel's response to Trujillo's question.  The second deposition the Defendants point to is Martinez', the relevant portion of which reads in full:

Q: Did you ask them for permission to go into the garage before you went in?

A: They just invited us in.

Q: What did they say to you?

A: Basically -- not to me; they didn't say nothing.  Officer Trujillo was talking to them, and then we talked to Mary, like I said, myself and Officer Lopez.

Q: Okay.  So did you overhear what they said to Officer Trujillo?

A: No.

Q: So you never heard them say anything about, Come into the garage, or, Come on in, or anything like that?

A: I can't remember.

Martinez Depo. at 15:12-16:1

When the officers arrived, Samantha Griego walked into the garage from the adjoining kitchen.  See Motion ¶¶ 13-14, at 4-5.  Upon seeing the officers, Griego either "went back upstairs," according to Mr. Roybal, Motion ¶ 14, at 5, or ran back into the house, according to the Defendants, see, e.g., Trujillo Depo. at 20:3-13.  The Defendants contend that Lopez-Salder and Martinez told Mrs. Roybal that they needed to check on why Griego ran into the house and get everyone together in the garage, and that she agreed once she was satisfied that they would not search the home.  See

-4-

Exhibit G to Response, Affidavit of Lorraine Lopez-Sadler ¶ 11-12, at 3 (executed February 2, 2007)("Lopez-Sadler Aff.")(Doc. 34-3); Martinez Depo. at 16:21-17:12.  Mr. Roybal maintains that Mrs. Roybal repeatedly told the officers that they could not come in.  See, e.g., Mary Roybal v. City of Albuquerque, CV 05-1326, Exhibit 7 to Plaintiff's Motion for Summary Judgment & Memorandum of Law in Support, Deposition of Joseph Roybal at 23:16-20 (taken October 17, 2006)("Joseph Roybal Depo.")(Doc. 32-2).

While the other Defendants approached the garage, Defendants Dennis Tafoya and Peter Dwyer went into the backyard of the Roybals' home.  See Motion ¶ 17, at 5.  The backyard is completely enclosed by a four-foot fence with a gate.  See Motion ¶ 3, at 3.  No paved path leads to the gate, and the home's electric meter is outside the gate.  See id.  Mr. Roybal asserts that the gate was closed, and that Tafoya and Dwyer had to open the gate to enter the backyard.  See id. ¶¶ 3, 18, at 3, 5.  The Defendants disagree and maintain that the gate had been left open.  See Response ¶¶ 3, 18, at 3, 5.  According to Dwyer, they entered the backyard because they were concerned someone might run out of the house to avoid the officers, see Exhibit A to Response, Deposition of Pete Dwyer at 11:3-6, 26:2-8 (taken October 17, 2006)("Dwyer Depo.")(Doc. 34-2), and to ensure that the area was secured and did not present officer-safety issues, see id. at 11:17-20.

While in the backyard, Tafoya and Dwyer noticed people in the upstairs of the home.  See Motion ¶ 19, at 5.  Mr. Roybal contends that the officers yelled at the people upstairs to let them in the house, but the Defendants maintain that they only asked them to come downstairs.  See Dwyer Depo. at 11:10-12:6; Exhibit H to Response, Deposition of Dennis Edwin Tafoya at 14:12-22 (taken October 3, 2006)(Doc. 34-3)("Tafoya Depo.").  Mrs. Roybal saw Tafoya and Dwyer at the back door, and yelled at them to not come in the back door and to come around to the front of the house. See Motion ¶ 21, at 6.  Tafoya and Dwyer entered the house through the back door.  See Motion ¶

22, at 6; Response ¶ 22, at 5 (denying lack of consent, but admitting entry).  The Defendants contend that Tafoya and Dwyer entered because they saw Martinez inside, and were thus under the reasonable belief that the homeowners had consented to entry.  See Tafoya Depo. at 20:14-17; Dwyer Depo. at 28:1-4 (stating that Martinez told Tafoya and Dwyer to come inside).  The Defendants also state that Tafoya and Dwyer were motivated by concerns for Martinez' safety, who they saw arguing heatedly with Mrs. Roybal.  See, e.g., Dwyer Depo. at 12:7-23, 13:3-8; Tafoya Depo. at 19:18-21, 20:13-22.

By this time, at least five APD officers were inside the house.  See Motion ¶ 23, at 6.  Dwyer made a protective sweep of the downstairs, checking for other occupants.  See id. ¶ 24, at 6.  The parties agree that Martinez checked the upstairs rooms, see Motion ¶¶ 27, 29, at 6, 7; Response ¶¶ 27, 29, at 6, but disagree about her reasons for doing so.  Mr. Roybal maintains that Martinez was conducting a protective sweep and that Mrs. Roybal told Martinez not to go up the stairs.  See Mary Roybal v. City of Albuquerque, CV 05-1326, Exhibit 2 to Plaintiff's Motion for Summary Judgment & Memorandum of Law in Support, Deposition of Mary Lucero-Roybal at 78:9-16 (taken September 28, 2006)(Doc. 32).  The Defendants contend that Martinez, with Mrs. Roybal's consent, had gone upstairs to bring down the girls who were upstairs.  See Martinez Depo. at 32:7-10.  After Martinez came back downstairs, all the occupants were escorted to the garage.  See id.  Mr. Roybal contends that Trujillo then arrested him after he called Trujillo an "asshole."  Motion ¶ 30, at 7.  The Defendants contend that Trujillo arrested Mr. Roybal "because of his combative behavior and refusal to obey orders."  Response ¶ 30, at 6 (citing Trujillo Depo. at 28:11-16).  Mr. Roybal contends that none of the minors at the house were drinking alcohol that night, but the Defendants argue that one underage drinker inside the home was cited.  See Dwyer Depo. at 22:10-13.

On November 18, 2005, Mrs. Roybal filed a Complaint against the City of Albuquerque,

Martinez, Tafoya, and Trujillo, as well as B. DeHerrera, who is not a party in this action.  Mrs. Roybal alleged that the officers' search of her home was unlawful and that she was arrested in retaliation for protesting the entry.  See Mary Roybal v. City of Albuquerque, CV 2005 08950, Complaint Under 42 U.S.C. Section 1983 for Recovery of Personal Injuries ¶¶ 4, 24 & 32 at 1, 3 & 4, filed November 18, 2005 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in this Court on September 17, 2008 (Doc. 30-2).  Although she initially filed her case in state court, the case was removed to federal court.

In federal court, Mrs. Roybal moved for summary judgment on the search, and Judge Johnson granted summary judgment in her favor.  Judge Johnson found that the warrantless entry into the garage violated a clearly established constitutional right of which any reasonable officer would know.  See Mary Roybal v. City of Albuquerque, No. CIV 05-1326, Memorandum Opinion and Order on Plaintiff's Motion for Summary Judgment at 13, entered March 20, 2007.  Judge Johnson then found that the entry into the backyard was unconstitutional.  See id. at 20.  Finally, Judge Johnson concluded that entry into the house proper from the backyard and garage was unconstitutional, and violated clearly established law.  See id. at 24.  The case then proceeded to a jury trial later in 2007.  Mr. Roybal was a key witness at the trial.  The jury returned a verdict against Mrs. Roybal on her remaining claims for wrongful arrest, retaliation, and municipal liability, but awarded her $42,000.00 for her unlawful search claim.  On the basis of the jury verdict, Judge Johnson entered a judgment awarding Mrs. Roybal $42,000.00 for her unlawful search claim and dismissing the remaining claims.  See Mary Roybal v. City of Albuquerque, No. CIV 05-1326, Judgment in a Civil Case, entered September 11, 2008.

## PROCEDURAL BACKGROUND

Mr. Roybal moves for summary judgment on his claim that the Defendants violated his

Fourth Amendment rights when they entered his home.  He first argues that offensive collateral estoppel precludes the Defendants from contesting this issue here.  He contends that all four elements of collateral estoppel are met in this case.  See Motion at 7-8.  Mr. Roybal contends that a final judgment was entered against several of the Defendants on the legality of the search of the Roybals' home.  See id. at 8.  This case, he asserts, involves different claims than the earlier case. See id.  Even though there is a not a complete symmetry between the defendants in Mrs. Roybal's action and the Defendants in this case, Mr. Roybal maintains that privity exists because the Defendants in this case who were not in the first case are APD officers who acted in concert and "were engaging in precisely the same acts alongside the defendants who were found liable."  Id. at 9.  Finally, he contends that the Defendants had a full and fair opportunity to litigate in the earlier case.  He maintains that even those Defendants who were not parties either participated in the earlier case or engaged in conduct that was identical to others', meaning that their direct participation would not have changed the outcome.  See id. at 9-10.

Mr. Roybal then turns to his second argument, that even if the Court declines to find estoppel here, the undisputed facts establish a Fourth Amendment violation.  He argues that precedent holds that crossing the threshold of a home is a search under the Fourth Amendment.  See id. at 10 (citing Payton v. New York, 445 U.S. 573, 576 (1980)).  Without a warrant, Mr. Roybal contends, such a search is only permissible when exigent circumstances are present.

Mr. Roybal argues that the first violation occurred when Martinez, Lopez-Sadler, and Trujillo entered the garage.  He contends that the opening of the garage door could not have reasonably been taken as an invitation, but that opening the door was necessary to allow the Roybals to speak with the officers.  See id. at 11.  Mr. Roybal next maintains that there was no emergency justifying the intrusion.  According to Mr. Roybal, the officers had been informed of loud noise and

-8-

saw in the garage two adults drinking beer.  He contends that this situation is "nowhere near the circumstances faced by the officers in Brigham City v. Stuart[, 547 U.S. 398 (2006)]."

In Brigham City v. Stuart, Mr. Roybal states, officers standing in a driveway saw juveniles drinking beer in the backyard and went into the backyard.  From the backyard, they witnessed an altercation between four adults and a youth.  The youth punched one of the adults in the face, who then spit blood into a sink.  Mr. Roybal argues that the information known to the officers here stands in sharp contrast to what the officers in Brigham City v. Stuart saw.  See Motion at 12-13.  Instead, Mr. Roybal maintains, the officers relied on statistic about underage drinking to assume that a crime was occurring in the home.  See id. at 13.

Mr. Roybal also contends that the situation here is distinct from the facts of United States v. Najar, 451 F.3d 710 (10th Cir. 2006), cert denied, 549 U.S. 1013, or United States v. Davis, 290 F.3d 1239 (10th Cir. 2002).  In United States v. Najar, he argues, the police had received a 911 call from within the home and therefore had reason to believe, when the resident refused to answer the door, that someone was trouble inside the home.  See Motion at 13-14.  In this case, Mr. Roybal maintains, there was simply a 911 call from someone outside the home about excessive noise.  In United States v. Davis, he further argues, law enforcement responded to a domestic violence call, justifying a warrantless entry.  See Motion at 14.

Mr. Roybal further argues that there were no other exigent circumstances.  He maintains that the police had nothing more than a vague suspicion of underage drinking and that only a complaint for noise had been lodged, without any mention of violence or drugs.  See id. at 15.  In sum, Mr. Roybal contends that the Defendants had no grounds for entering into the garage without a warrant.

Mr. Roybal argues that a second violation occurred when Tafoya and Dwyer walked into the backyard of his home.  He asserts that the backyard is part of the curtilage of the home and therefore

entitled to Fourth Amendment protection.  See id. at 15-16 (citing Oliver v. United States, 466 U.S. 170, 180 (1984)).  He contends that, for the same reasons the officers lacked a reason to enter his garage, Tafoya and Dwyer did not have any basis to enter the backyard.  See id. at 16-17.

Mr. Roybal next argues that the unlawful search continued when Martinez and Lopez-Sadler entered the house from the garage, and when Tafoya and Dwyer entered the house from the backyard.  Mr. Roybal argues that nothing justified Martinez and Lopez-Sadler's move from the garage to the house.  In particular, he contends that there was no consent demonstrated from the Roybals' silence in response to the officers' statements that they were going inside and that any consent would have been tainted because of the unlawful entry of the garage immediately before. See id. at 17-19.

The entry from the backyard was unlawful, Mr. Roybal argues, because it was allegedly based on Tafoya and Dwyer seeing Martinez arguing with Mrs. Roybal inside the home.  Mr. Roybal contends that the officers were unlawfully in the backyard.  Tafoya and Dwyer, he contends, cannot rely on what they observed from the backyard as grounds for entering the house or on any apparent emergency that the conduct of an officer has created.  See id. at 19-20.

Finally, Mr. Roybal argues that the Fourth Amendment violations were deepened when the officers conducted an unlawful protective sweep of the home.  Mr. Roybal contends that the United States Court of Appeals for the Tenth Circuit has held that such sweeps are only permissible incident to arrest or in exigent circumstances.  See id. at 20 (citing United States v. Freeman, 479 F.3d 743 (10th Cir. 2007).  According to Mr. Roybal, the sweep occurred before any arrests, and the arrests were also conducted outside the home, not inside.  See id. at 21.  Mr. Roybal contends that the only articulated reason the Defendants had for their sweep was a young woman running into the home, but Mr. Roybal asserts that the Defendants failed to provide any justification for how the woman's

running would pose a threat to the Defendants or otherwise justify a protective sweep.  See id. at 21-22.

In response, the Defendants first reference their own motion for summary judgment and argue that Mr. Roybal cannot invoke collateral estoppel because res judicata, collateral estoppel, and laches bar his claim.  See Defendants' Response to Plaintiffs' Motion for Summary Judgment at 8-10, filed October 20, 2008 (Doc. 34)("Response").  Turning to Mr. Roybal's arguments, the Defendants urge the Court to not apply preclusion here, because doing so would "reward Mr. Roybal for his intentional delay in bringing his claims."  Id. at 10.  The Defendants point out that Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979), treats offensive estoppel differently than defensive estoppel.  They contend that it would be unfair to estop them here, because had they known that Mr. Roybal was going to sue, they would employed a different and more aggressive litigation strategy in Mrs. Roybal's case.  See Response at 11.  They further maintain that Mr. Roybal could easily have joined Mrs. Roybal's lawsuit, bringing the situation with Parklane Hosiery Co. v. Shore's admonition to not allow offensive estoppel "*where a plaintiff could easily have joined in the earlier action . . . .*"  Response at 11 (quoting Parklane Hosiery Co. v. Shore, 439 U.S. at 331)(emphasis added by Response).

The Defendants also argue that public-policy considerations weigh against permitting offensive estoppel against the City of Albuquerque or its police officers.  The Defendants note that the Supreme Court has held that the federal government cannot be offensively estopped because, among other reasons, government litigation is motivated by a number of factors besides winning and losing.  See Response at 12 (citing United States v. Mendoza, 464 U.S. 154 (1984)).  They contend that the same principles support the Court refusing to allow offensive preclusion here.  Drawing on New Mexico state law, the Defendants also note that New Mexico has found that there is a strong

public interest in not allowing offensive collateral estoppel to be used against the public lands commissioner.  See id. at 13 (citing Bogle Farms, Inc. v. Baca, 122 N.M. 422, 925 P.2d 1184 (1996)).

The Defendants then address the merits of Mr. Roybal's unlawful-entry claim.  The Defendants contend that Judge Johnson erred in granting summary judgment to Mrs. Roybal.  They maintain that there are many conflicting inferences that can be drawn from the facts that preclude summary judgment, and particularly note that "the facts surrounding the consent issue were, and still are, greatly in dispute."  Response at 15.

Mr. Roybal counters that the Defendants do not show any issues of material fact in dispute. He argues that there are no material facts in dispute, making the determination of the reasonableness of the entry a question of law.  See Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Partial Summary Judgment & Memorandum of Law in Support at 5-6, filed November 6, 2008 (Doc. 36)("Reply").  He maintains that facts clearly show that there was no consent for the officers' entry.  See id. at 6.

Turning to the Defendants' contentions of unfairness if they are estopped, Mr. Roybal argues that the City of Albuquerque had the incentive to vigorously litigate Mrs. Roybal's claim and did so.  He notes that overall payments the City of Albuquerque made in Mrs. Roybal's case was among the top ten claims payments of its year.  See id. at 7.  Mr. Roybal also asserts that Beatrice Brickhouse, the former attorney for all the Defendants except for Dwyer, was informed that Mr. Roybal would bring suit before the time for appeal expired.  See id.  Mr. Roybal further contends that he never misled the City of Albuquerque, pointing out that the testimony on which the Defendants rely indicates only that Mr. Roybal did not know why he had not filed a lawsuit.  See id. at 7-8.  Mr. Roybal maintains that attorneys have an obligation to zealously represent their

clients, and that Mr. Roybal's and his counsel's conduct was based on a proper motivation to bring Mr. and Mrs. Roybal's cases separately, to maximize the chances that their rights would be vindicated because counsel believed that Mrs. Roybal's claims had more jury appeal without Mr. Roybal.  See id. at 8-10.

The Defendants have also filed a motion for summary judgment on the basis of qualified immunity that covers the same Fourth Amendment issues raised in Mr. Roybal's motion and the Court will consider those arguments here.  In their motion, the Defendants argue that they had reasonable grounds to believe they had consent because the garage door was opened in response to their knocking, the Roybals freely engaged them in conversation, and did not object to the officers entering the garage.  See Defendants' Second Motion for Summary Judgment (Including Individual Defendants' Request for Qualified Immunity) at 9, filed November 19, 2008 (Doc. 39)(footnote omitted).  The Defendants also contend that Mrs. Roybal consented to Martinez and Lopez-Sadler entering the residence area from the garage, and that both exigent circumstances and consent justified  Dwyer and Tafoya's entering the residence from the backyard.

At the hearing, the Court questioned Mr. Roybal's attorney, Joseph P. Kennedy, whether the Defendants who were not parties to Mrs. Roybal's case could be estopped here, given the recent holding in Taylor v. Sturgell, 128 S.Ct. 2161 (2008).  See Transcript of Hearing at 30:22-31:10, 31:20-32:3 (taken January 5, 2009)(Court)("Tr.").[3]  Mr. Kennedy did not expressly concede the point, but stated that he tended to agree that the non-party officers would not fit within the exceptions to non-party exclusion in Taylor v. Sturgell.  See Tr. at 32:4-9 (Kennedy).  Mr. Kennedy clarified that his motion was aimed at unlawful entry and not any further claims of unlawful seizure.

---

[3] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain different page and/or line numbers.

See id. at 36:12-20 (Court & Kennedy).  Mr. Kennedy also clarified that the primary Fourth Amendment violation was the entry itself and that Mr. Roybal was not seeking compensatory damages on other aspects of the officers' entries.  See Tr. at 54:14-55:9 (Court, Brickhouse & Kennedy), 61:2-5 (Allen & Kennedy).

Patrick D. Allen, Dwyer's counsel, argued that the Complaint did not raise a claim for entry into the backyard, but only for entry into the house from the back door.  See id. at 51:8-17 (Allen). Mr. Kennedy disagreed and argued that the Complaint used the word "home," which should be read to include the garage and the backyard.  See id. at 56:9-15 (Kennedy).  Mr. Allen emphasized that qualified immunity was an issue here and that a reasonable officer could believe that there was consent.  See id. at 51:3-7, 51:17-25 (Allen).  Mr. Kennedy argued that the reasonableness standard was an objective test, and that a reasonable officer would know that unequivocal and unambiguous consent was required, which he contended the facts did not show.  See id. at 58:17-59:1 (Kennedy).

## LAW REGARDING OFFENSIVE COLLATERAL ESTOPPEL

Collateral estoppel, or issue preclusion, can be used either defensively or offensively.  "In both the offensive and defensive use situations, the party against whom estoppel is asserted has litigated and lost in an earlier action."  Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 329 (1979).  Offensive estoppel allows plaintiffs to prevent defendants from contesting issues that they have previously had decided against them.  The demise of the mutuality doctrine allows a plaintiff to assert estoppel against a defendant who lost an earlier suit even if the plaintiff was not a party to the earlier suit.  The key is not that the defendant had a chance to litigate against the plaintiff, but that the defendant had a chance to litigate the issue, whomever the opponent was.

"The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where . . . the application of offensive estoppel would be unfair to a defendant, a

trial judge should not allow the use of offensive collateral estoppel." Id. at 331.  Unfairness to a defendant can result from a variety of situations, including: (i) if the "defendant in the first action is sued for small or nominal damages [and thus] may have little incentive to defend vigorously, particularly if future suits are not foreseeable," id. at 330; (ii) if "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant," id. and (iii) if "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result," id. at 331.

"Courts generally have broad discretion in using offensive estoppel . . . ." Meredith v. Beech Aircraft Corp., 18 F.3d 890, 894-95 (10th Cir. 1994).

> Under *Parklane*, if the components of collateral estoppel are satisfied, its benefits of economizing judicial resources and lessening the burdens of relitigating identical issues already decided, would be afforded a non-mutual plaintiff provided defendant had previously had a full and fair opportunity to litigate the issue. Importantly, the decision to eliminate the mutuality requirement to permit the plaintiff such a windfall was placed within the trial court's "broad discretion."

Dodge v. Cotter Corp., 203 F.3d 1190, 1198 (10th Cir. 2000)(quoting Parklane Hosiery Co., Inc. v. Shore, 439 U.S. at 331).

## LAW REGARDING THE FOURTH AMENDMENT AND WARRANTLESS SEARCHES OF HOMES

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV.  "[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'"  United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993)(quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).  "A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent."  United States v. Pikyavit, 527 F.3d 1126, 1130 (10th Cir. 2008).  The Fourth Amendment's

-15-

protection of the home against warrantless searches extends to a home's curtilage.  See United States v. Dunn, 480 U.S. 294 (1987); Oliver v. United States, 466 U.S. 170 (1984).

### 1.  **Curtilage.**

In United States v. Dunn, the Supreme Court articulated four factors that should be used when determining whether an area is within the curtilage of a house for Fourth Amendment purposes.  These factors are "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  480 U.S. at 301.  Backyards that are enclosed and adjacent to a house are generally considered to be part of the curtilage.  See United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003); United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997).  Even partially enclosed backyards have been found to be part of a home's curtilage.  See, e.g., United States v. Swepston, 987 F.2d 1510, 1515 (10th Cir. 1993)(holding partial enclosure consistent with area being curtilage), overruled in part on other grounds by United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006); United States v. Jenkins, 124 F.3d at 773 (same).

### 2.  **Consent.**

A warrantless search is constitutional if consent is given for the search.  Consent to a search must be unequivocal, specific, and freely given.  See United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007); United States v. Davis, 197 F.3d 1048, 1052 (10th Cir. 1999); United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992).  Consent does not need to be spoken, but "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."   United States v. Guerrero, 472 F.3d at 789-90.  "Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."

United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999).  In United States v. Gordon, for example, the Tenth Circuit found implied consent when, in response to an officers' asking whether the defendant could open a locked bag, the defendant handed the officer the key.  See id.

**3.      Exigent Circumstances.**

A warrantless search of a home can also be constitutional when there are exigent circumstances.   For exigent circumstances regarding safety to justify a warrantless search of a home: "(1) the officers [must have] had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry [must have been] reasonable."  United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008).  See United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986).  While officers do not need probable cause to establish that exigent circumstances existed, "there must be some reasonable basis, approaching probable cause," supporting the search of the area.  United States v. Smith, 797 F.2d at 840 (internal quotation marks omitted).

**LAW REGARDING QUALIFIED IMMUNITY**

As the Court has previously recognized in Holguin v. City of Albuquerque, No. CIV 05-0302 JB/RHS, 2006 U.S. Dist. LEXIS 29489 (D.N.M.):

> Qualified immunity recognizes the legitimate "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)(quoting Butz v. Economou, 438 U.S. 478, 506 (1978)).  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

2006 U.S. Dist. LEXIS 29489, at *15-16.  Qualified immunity protects federal and state officials from liability for discretionary functions, and from "the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit."  Siegert v. Gilley, 500 U.S. 226, 232 (1991).

-17-

Qualified immunity shields state officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. at 818.  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984).  Until recently, courts were required to apply a two-step analysis in deciding whether a party is entitled to qualified immunity.  First the Court would determine whether the defendant violated a constitutional right and, if so, would then consider whether the right violated was clearly established. See Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 129 S. Ct. 808 (2009).  In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory." 129 S. Ct. at 818.  To find that qualified immunity does not apply, however, a court must address both steps of the inquiry.  See Train v. City of Albuquerque, No. CIV 08-0152 JB/RLP, Memorandum Opinion and Order at 16, entered April 13, 2009 (Doc. 33).

## ANALYSIS

Mr. Roybal's waiting until after the success of his wife's lawsuit is the sort of litigation strategy that the Supreme Court has singled out as being for what offensive non-mutual collateral estoppel, or issue preclusion, should not be used.  Addressing the merits, the Court nonetheless reaches the same result because it agrees with Judge Johnson's reasoning in Mrs. Roybal's lawsuit. The Court thus finds that the entries into the garage and the backyard were unconstitutional. Because it is the entries for which Mr. Roybal is seeking damages, whether the various individual Defendants moving further into the home is separate grounds for liability is not a relevant issue.

## I.    THE COURT WILL NOT ALLOW MR. ROYBAL TO USE OFFENSIVE <u>COLLATERAL ESTOPPEL</u>.

Offensive non-mutual collateral estoppel has four mandatory elements in the Tenth Circuit: "(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." <u>Dodge v. Cotter Corp.</u>, 203 F.3d at 1198 (10th Cir. 2000)(internal quotation marks omitted); <u>United States v. Rogers</u>, 960 F.2d 1501, 1508 (10th Cir. 1992).  The Defendants do not challenge that the basic requisites for preclusion are met.  Rather, they contend that the discretionary factors identified in <u>Parklane Hosiery Co., Inc. v. Shore</u> indicate that the Court should not allow offensive preclusion here.  The Court agrees.  Mr. Roybal's decision to wait until the resolution of Mrs. Roybal's claims is a "wait and see" approach to litigation that drew the Supreme Court disapproval in <u>Parklane Hosiery Co., Inc. v. Shore</u>.

"The general rule should be that in cases where a plaintiff could easily have joined in the earlier action . . . a trial judge should not allow the use of offensive collateral estoppel." <u>Parklane Hosiery Co., Inc. v. Shore</u>, 439 U.S. at 331.  Mr. Roybal's lawsuit falls within the terms of this general prohibition.  Mr. Roybal was fully aware of his wife's lawsuit.  He was deposed and acted as a witness at her trial.  There was nothing preventing Mr. Roybal from joining in the earlier action.  In fact, Mr. Roybal's counsel admits that the decision to refrain from bringing Mr. Roybal's action earlier was a tactical decision.  Having waited for his wife's lawsuit to reach a favorable conclusion, Mr. Roybal cannot now invoke preclusion to bar the Defendants from litigating the lawfulness of their search of Mr. Roybal's home.

Additionally, the underlying policy for allowing offensive estoppel is efficiency.  See Dodge v. Cotter Corp., 203 F.3d at 1198.  Here, efficiency would not be served even if the Court permitted Mr. Roybal to employ offensive issue preclusion against the Defendants.  Two of the current Defendants were not defendants in the previous lawsuit.  Taylor v. Sturgell, as the Court has discussed in its recent Memorandum Opinion and Order, has narrowed the circumstances in which non-party preclusion is allowed.  See Memorandum Opinion and Order at 10-15, entered February 2, 2009 (Doc. 51).  The new Defendants would not fit within any of the six exceptions to non-party preclusion laid out in Taylor v. Sturgell and so would not be in privity with the defendants in Mrs. Roybal's case.  Because these two new Defendants are not in privity with the earlier defendants, the Court will have to decide the motion for summary judgment on the merits of the Fourth Amendment issues anyway.  One of the new Defendants, Dwyer, entered the backyard.  Another new Defendant, Lopez-Sadler, entered the garage.  Because they were engaged in the two separate episodes at issue in this motion, even if the Court estopped the remaining Defendants the Court will still need to address the same legal issues.

## II.     THE DEFENDANTS' ENTRY INTO THE GARAGE AND THE BACKYARD OF THE ROYBALS' HOME VIOLATED THE FOURTH AMENDMENT.

"[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'"  United States v. Lowe, 999 F.2d at 451 (quoting United States v. United States District Court, 407 U.S. at 313).  The Court agrees with Judge Johnson's decision that the entries into the garage and the backyard of the Roybals' home were unconstitutional searches, and that the Defendants are not entitled to qualified immunity for those entries.  Based upon the discussions at the hearing and what Mr. Roybal seeks for damages, the Court does not find it necessary to address whether the Defendants advancing further into the house proper was a separate

violation of the Fourth Amendment.

**A.    THE ENTRY INTO THE GARAGE WAS UNCONSTITUTIONAL.**

Several officers entered the Roybals' garage.  They did not have a warrant and so their entry must be justified under one of the exceptions to the warrant requirement for the search of a home. See United States v. Pikyavit, 527 F.3d at 1130 ("A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent.").  For the garage entry, the Defendants rely on the Roybals having consented to the entry.  The undisputed facts, however, show that there was no consent and that the entry into the garage was thus unconstitutional under the Fourth Amendment.

Before turning to whether the entry was lawful, the Court will first identify the undisputed facts.  According to the Defendants, they had express consent to enter.  Nothing in the record supports this contention.

First, the Defendants point to Trujillo's deposition testimony.  Trujillo, however, says that he was not expressly invited inside.

> A. . . .  I didn't immediately walk in.  I mean, there was some conversation, you know, when I asked.  And then as -- of course, they were at the far end of the garage. I wasn't going to sit there and holler from one end to the other.  So after, you know, they identified themselves as being the owners, I walked inside and we having a conversation inside the garage area.
>
> Q. Did you ask them if you could go in?
>
> A. No.
>
> Q. Did they invite you in?
>
> A. Did they say, "Come on in"?
>
> Q. Yeah.
>
> A. No.

Trujillo Depo. at 19:2-15 (underlining added in copy of deposition attached to Response).  Although the Defendants highlight this testimony, Trujillo was asking for clarification of the question, "Did they invite you in?"  When the clarification was received, Trujillo stated that he was not invited inside.

Second, the Defendants point to Martinez' deposition.  Martinez asserted that the officers were invited into the garage, but when asked about the basis for this conclusion, she stated that she had not been invited in and could not remember even overhearing one of the other officers being given consent.  See Martinez Depo. at 15:12-16:1.  There is therefore no evidence of express consent.  The Defendants must rely upon implied consent.

The relevant facts are few.  Someone opened the garage door.  Although Mr. Roybal contends that the officers immediately came inside, the Defendants contend that they walked inside while speaking to the Roybals.  See Trujillo Depo. at 18:11-16, Martinez Depo. at 15:8-11.  On summary judgment, the Defendants version of events as the non-movants must control.  According to Trujillo, the Roybals "were at the far end of the garage," and he was not "going to sit there and holler from one end to the other."  Trujillo Depo. at 19:4-6.  "So after . . . [the Roybals] identified themselves as being the owners," Trujillo stepped inside.  Id. at 19:6-8.  Martinez also walked in.  Even with all reasonable inferences drawn in their favor, as the Court must here, these facts do not establish that the Defendants had consent to enter the garage.

Consent to a search must be unequivocal, specific, and freely given.  See United States v. Guerrero, 472 F.3d at 789; United States v. Davis, 197 F.3d at 1052; United States v. Butler, 966 F.2d at 562.  Consent need not, however, be spoken.  "Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  Nonverbal conduct may suffice

when "considered with other factors." United States v. Gordon, 173 F.3d at 766. In United States v. Gordon, for example, the Tenth Circuit found implied consent when, in response to an officers' asking whether the defendant could open a locked bag, the defendant handed the officer the key. See id.

Viewing the evidence in the light most favorable to the Defendants, there is no conduct from which consent can be reasonably inferred. When the garage door was opened, by the Defendants' version of events, they did not step inside. Upon the opening of the door, no one gestured or made some other indication that the Defendants were to step inside. No one, for instance, opened the door and then turned around to walk deeper into the garage. It is also difficult to see how the opening was some sort of invitation given the need for the door to be open to allow for communication. The situation is not much different from someone opening the front door of a house to speak with an officer at the door, and it is clear that answering the door does not serve to allow a police office to conduct a warrantless search. Interpreting the opening of the door -- whether it was in response to knocking, as the Defendants allege, or because Mrs. Roybal saw police boots outside, as Mr. Roybal argues -- as a signal to enter is unreasonable.

The Defendants also rely on the lack of objection to the entry and on the Roybals willingly speaking with the Defendants. By the time the Roybals could have objected to entry into the garage, however, the Defendants had already entered the garage. This situation is not one where police officers ask for permission to come inside and are met with silence. Although "failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what [is later claimed] was a more limited consent, is an indication the search was within the scope of consent," United States v. Gordon, 173 F.3d at 766, this rule applies to the limitation on an already given authorization to a search and does require that a person object to a search before the search

-23-

occurs.  Before the Defendants entered the garage, they needed an unequivocal manifestation of consent.  They cannot rely on a lack of objection after entering to justify the entry.

Speaking with the officers also is not a sign of consent.  It is hard to believe that, to avoid giving the unequivocal consent necessary for a warrantless entry, a person is required to scrupulously maintain silence.  Nothing about simply talking, without the use of some language indicating consent, is an invitation to entry.  The closest the Defendants come to consent is that the Roybals were apparently on the other side of the garage and so speaking was not as easy as if they were close to the Defendants.  Convenience is not, however, a justification for a warrantless entry. And nothing about speaking from farther away than one could be speaking suggests an invitation to cross the threshold.

The Defendants did not ask for consent to enter.  No express consent was volunteered.  The Roybals spoke with the Defendants, but made no statements and made no gestures or other nonverbal conduct that might indicate some sort of invitation to enter.  In these circumstances, it is clear that there was no consent, either express or implied.  The entry into the garage was thus unconstitutional.

Lack of consent does not end the inquiry.  Normally, issues about the constitutionality of a search in a § 1983 lawsuit arise in the context of a defendant's motion for summary judgment on the basis of qualified immunity.  The Defendants have filed a separate motion for qualified immunity that includes the entry into the garage.  When considering whether to grant summary judgment to a plaintiff on the lawfulness of a search, the Court believes that it is appropriate to consider the qualified immunity standard, which holds individual officers liable only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. at 818, particularly where

the defendants are asserting qualified immunity, as the Defendants are here in a separate motion, <u>see</u> <u>Train v. City of Albuquerque</u>, No. CIV 08-0152 JB/RLP, Memorandum Opinion and Order at 16, entered April 13, 2009 (Doc. 33).  Qualified immunity, however, will not shield the Defendants here.

An officer's need to obtain clear consent before making a warrantless entry into a home or otherwise engaging in a search under the Fourth Amendment is well established.  The Tenth Circuit has reiterated this basic requirement over many years, since long before the conduct here.  <u>See</u> <u>United States v. Guerrero</u>, 472 F.3d at 789 (2007); <u>United States v. Davis</u>, 197 F.3d at 1052 (1999); <u>United States v. Butler</u>, 966 F.2d at 562 (1992).  The issue here is largely factual.  The Defendants did not ask for permission to enter, were not informed they could enter, and there is no evidence of any affirmative action which might be interpreted as consent.  In these circumstances, no reasonable officer would have believed he or she had consent to enter the garage.  Martinez and Lopez-Sadler are not entitled to qualified immunity in these circumstances, and the Court will grant summary judgment to Mr. Roybal on their entry into the garage being in violation of the Fourth Amendment. While the Court sees little to distinguish Trujillo's conduct form Martinez' and Lopez-Sadler's conduct, Trujillo was not served with process until after this motion was filed and until after the hearing.  At the present time, the Court will not grant summary judgment regarding Trujillo's actions.

## B.    THE ENTRY INTO THE BACKYARD WAS A VIOLATION OF THE FOURTH AMENDMENT.

As a threshold matter, the Court must determine whether the Complaint alleges that the entry into the backyard was unconstitutional.  The Complaint describes the entry.  <u>See</u> Complaint ¶ 6, at 2.  In the claim for relief for unlawful searches, the Complaint mentions "residence."  <u>Id.</u> ¶ 21, at

3.  Mr. Roybal urges the Court to read "residence" broadly to include the backyard.  It is not unreasonable to consider one's home or residence to include more than just the building and, as the Court will explain, Fourth Amendment law treats most backyards as part of the home that is subject to protection against unreasonable searches and seizures.  With these principles in mind and given that the Complaint gives notice of the conduct at issue, the Court concludes that the Complaint alleges that the entry into the backyard was an unlawful search.

The Supreme Court has recognized that the Fourth Amendment's protections have been expanded to curtilage and that courts have defined curtilage by "reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private."  Oliver v. United States, 466 U.S. at 180.  In United States v. Dunn, the Supreme Court articulated four factors that should be used when determining whether an area is within the curtilage of a house for Fourth Amendment purposes.  These factors are "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  480 U.S. at 301.  Applying these factors here, the Court concludes that the entry into the backyard was a warrantless intrusion into the curtilage of the Roybals' home.

With the exception whether the gate was open or closed, the relevant facts regarding the backyard are undisputed.  The undisputed facts all support the Roybals' backyard being part of the curtilage and entitled to Fourth Amendment protection.  The backyard was directly adjacent to the house, so the first factor supports the backyard being curtilage.  It was completely enclosed on all sides, with the exception of a gate that was open, so the second factor supports a finding of curtilage.  See United States v. Swepston, 987 F.2d at 1515 (10th Cir. 1993)(finding that incomplete fence can

support an area being curtilage).  The meter was outside the gate and not in the backyard, indicating that the backyard was used for private purposes and protected from people passing by.  See United States v. Cousins, 455 F.3d at 1123 (finding that electric meter being located in sideyard weighed against yard being curtilage).  No path leads up to the gate into the backyard.  See id. at 1122-23 (finding that paved walkway leading into sideyard weighed against yard being curtilage).  The third and fourth factors thus all indicate that the backyard was curtilage.

The Court is convinced that the backyard was within the curtilage of the Roybals' home. Enclosed backyards are areas that most people consider private and are under Fourth Amendment protection.  See United States v. Hatfield, 333 F.3d at 1196; United States v. Jenkins, 124 F.3d at 772-73.  The lone wrinkle here is the open gate.  This fact, however, does not change the result.

As an initial matter, the open gate here only reduces somewhat the strength the enclosure factor gives to finding the Roybals' backyard to be curtilage.  All the other factors point to curtilage, and even with the open gate, the backyard was still largely enclosed.  See, e.g., United States v. Swepston, 987 F.2d at 1515 (holding partial enclosure consistent with area being curtilage); United States v. Jenkins, 124 F.3d at 773 (same).  The Court has also surveyed cases from both federal and state courts involving open gates and how this fact affects curtilage.  Many cases deal with situations involving officers observing something through an open gate, or entering through an open gate where the fence encloses the whole house and access to the house requires passing through the fence.  Interestingly, the Court has located only a single case where an officer walked through an open gate into a backyard without some specific justification for doing so.  In that case, Brown v. State, 75 Md.App. 22, 35, 540 A.2d 143 (Md.App. 1988), the Maryland Court of Appeals found the intrusion to be a clear violation of the Fourth Amendment.

Those other cases dealing with open gates have involved scenarios substantially different

than here.  For example, in <u>United States v. Cousins</u>, the Tenth Circuit held that a sideyard which was only enclosed on three sides, contained an electric meter, and had a paved path leading into it was not part of the curtilage.  <u>See</u> 455 F.3d at 1122-24.  None of these factors, which the Tenth Circuit found were the features that distinguished the sideyard from other cases finding partially enclosed spaces to be curtilage, are present here.  Courts have also found that passing through an open gate to walk to the entrance of a home does not involve an intrusion of the curtilage.  <u>See</u>, <u>e.g.</u>, <u>United States v. Thomas</u>, 120 F.3d 564, 571-72 (5th Cir. 1997)(finding that the police did not violate the Fourth Amendment when they approached the front door of an apartment by walking through an open gate because "the officers could reasonably believe that the gate provided the principal means of access to the apartment").  Finally, courts have found that officers can <u>look through</u> an open gate or open door under the plain-view doctrine.  <u>See</u>, <u>e.g.</u>, <u>State v. Lane</u>, 393 N.J.Super. 132, 145-46, 922 A.2d 828, 836 (N.J.Super. A.D. 2007)(stating that evidence observed in backyard through an open gate can fall within plain-view doctrine).  No case the Court has found has allowed officers to pass through an open gate into an otherwise enclosed backyard.  Despite the open gate, the backyard was curtilage.

When Dwyer and Tafoya passed beyond the fence around the backyard, regardless whether the gate was open or closed, they entered the curtilage of the Roybals' house.  Because they did not have a warrant, this entry was unconstitutional unless an exception to the warrant requirement was present.  <u>See</u> <u>United States v. Pikyavit</u>, 527 F.3d at 1130 ("A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent.").  None were.  Dwyer states that Dwyer and Tafoya entered the backyard because they were concerned someone might run out of the house to avoid the officers, <u>see</u> Dwyer Depo at 11:3-6, 26:2-8, and to ensure that the area was secured and did not present officer-safety issues, <u>see</u> <u>id.</u> at 11:17-20.  Generalized concerns about

-28-

officer safety or people fleeing are not justifications for the warrantless entry into a house.  See Mary Roybal v. City of Albuquerque, No. CIV 05-1326, Memorandum Opinion and Order on Plaintiff's Motion for Summary Judgment at 18; United States v. Trujillo, 2004 WL 1502484 at *4 (D.Kan.).  Exigent circumstances regarding safety requires that "(1) the officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry was reasonable." United States v. Reeves, 524 F.3d at 1169.  See United States v. Smith, 797 F.2d at 840.  There is no evidence that the officers reasonably perceived any immediate need to enter the backyard in the interests of safety. Furthermore, neither Dwyer nor Tafoya were aware of any particular person that might flee the home or even that there was anyone who had committed a crime within the home when they entered the backyard.  In sum, based on the undisputed evidence, neither Dwyer nor Tafoya were aware of any circumstances that justified a warrantless entry into the backyard.

The question becomes, therefore, whether Dwyer and Tafoya are entitled to qualified immunity.  Courts have been applying the United States v. Dunn factors for over two decades.  More specifically, enclosed backyards have been recognized as entitled to Fourth Amendment protection. See United States v. Hatfield, 333 F.3d at 1196; United States v. Jenkins, 124 F.3d at 772-73.  While the Tenth Circuit has not spoken on the precise question, other circuits, in cases decided several years before the events here, have held that enclosed backyards being part of the curtilage of a home is clearly established law.  The Second Circuit summarily rejected a contention to the contrary as being "without merit." Brocuglio v. Proulx, 67 Fed.Appx. 58, 61 (2d Cir. 2003).  In Daughenbaugh v. City of Tiffin, 150 F.3d 594 (6th Cir. 1998), the United States Court of Appeals for the Sixth Circuit noted that "the law seems relatively unambiguous that a backyard abutting the home

constitutes curtilage and receives constitutional protection." Id. at 603.[4]

Even with the gate being open, the Court believes that the officers' conduct violated clearly established law. The backyard remained substantially enclosed, with its boundaries clearly marked. See Oliver v. United States, 466 U.S. at 182 n.12 (observing that the boundaries of the curtilage at most homes is clearly marked). Given that even partially enclosed spaces have been held to be entitled to Fourth Amendment protection for some years, see, e.g., United States v. Swepston, 987 F.2d at 1515, the Court does not believe that the law was not clearly established at the time or that a reasonable officer could have believed that a gate being left open allowed the officer to walk into a fenced-in backyard. Rather, "'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). While "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains," it is not necessary for the "plaintiffs to find a case with exact corresponding factual circumstances; defendants are required to make reasonable applications of the prevailing law to their own circumstances," Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)(internal quotation marks omitted). Here, a reasonable application of the prevailing law leads inevitably to the conclusion that walking through an open gate into an enclosed backyard

---

[4] The Sixth Circuit went on to find qualified immunity despite the intrusion, but on the basis that the officers could have reasonably believed on the basis of other case law that they were entitled to pass through the curtilage to reach a detached garage that they reasonably believed was not curtilage. See 150 F.3d at 603. The Sixth Circuit found that the officers were wrong on both points and could not rely in the future on such arguments, but that it was not, at the time, clearly established that a detached garage was not curtilage and that it was unlawful to pass through curtilage to reach an area that could be searched. See id.

is entry into the curtilage of a home.  In fact, the various cases dealing with peripheral circumstances such as observing something in a backyard through an open gate are premised on the idea that the observation and the plain-view doctrine are necessary because simply entering into the backyard without permission is unconstitutional.  Walking into the backyard was a violation of clearly established law.  Nor could a reasonable officer have believed that a generalized concern about safety or flight would justify the intrusion.  See Mary Roybal v. City of Albuquerque, No. CIV 05-1326, Memorandum Opinion and Order on Plaintiff's Motion for Summary Judgment at 18; United States v. Trujillo, 2004 WL 1502484 at *4.  It has long been the law in the Tenth Circuit that exigent circumstances requires that officers have "reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others."  United States v. Smith, 797 F.2d at 840 (decided 1986).  Accordingly, Tafoya and Dwyer are  not entitled to qualified immunity for entering the backyard, and Mr. Roybal is entitled to summary judgment that the entry was unconstitutional.

### C.   THE ENTRIES FURTHER INTO THE HOME ARE NOT RELEVANT.

In his motion, Mr. Roybal also asks the Court to declare that the Defendants' entry into the house proper and that the alleged protective sweep of the house were unconstitutional.  As discussed at the hearing, however, Mr. Roybal does not seek damages for the Defendants moving into the upstairs of the home and so the issue whether there was separate consent to enter the house proper is irrelevant.  See Tr. at 54:14-55:25 (Court, Kennedy & Brickhouse).[5]  Although there was some

---

[5] The relevant portion of the transcript reads:

THE COURT:  So you're not seeking any damages for being upstairs.

MR. KENNEDY:  No.

confusion at the hearing regarding whether damages were sought for the entry into the backyard and thus the parties did not clearly agree that the separate entry from the backyard to the house was also irrelevant, the Court believes the analysis is the same on that point. The unlawful entries occurred when the various Defendants entered the garage and the backyard respectively.  Given that Mr. Roybal seeks damages for the initial entries, the parties' agreement that the entry into the home from the garage is irrelevant, and the Court's ruling that the Defendants' initial entry into the garage and the backyard were unconstitutional, the Court does not view the Defendants continuing deeper into the home as relevant to liability, and the Court will not address those issues here.[6]

**IT IS ORDERED** that the Plaintiff's Motion for Partial Summary Judgment is granted in part and denied in part without prejudice.  The Court grants summary judgment to Plaintiff Rubel

---

THE COURT:  I guess if that's the case . . . this sort of separate consent seems to be irrelevant.

MS. BRICKHOUSE:  Right.

THE COURT:  He's seeking damages by saying there was no con[sent] to come in the garage.

MS. BRICKHOUSE:  Okay that wasn't clear to me.

THE COURT:  It [wasn't to me either].  You kind of agree with me it kind of falls to the way once they stepped through the threshold that's when the damage occurred in fact they walked around they make it a little bit more of a it wasn't clear to me either that's why I asked the question more egregious or more pronounced but there's no more damages to it.

MS. BRICKHOUSE:  That's fine I'm glad it's clarified.  That's wasn't clear.  That's been cleared.  That argument definitely falls by the way side.

Tr. at 54:25-55:19.

[6] Should the issue become relevant for some reason, the Court has heard the argument on the issues and has the parties' briefing, so if necessary the parties may raise the issue at a later time without the need to file new briefing.

Roybal with respect to the entry into the backyard and the garage. The remainder of the motion is denied without prejudice as being irrelevant given the Court's ruling and the damages the Plaintiff seeks. The grant of summary judgment does not extend to Defendant George Trujillo.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Joseph P. Kennedy
Shannon L. Kennedy
Mary Louise Boelcke
Kennedy & Oliver, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Kathryn Levy
Beatrice J. Brickhouse
City of Albuquerque Legal Department
Albuquerque, New Mexico

     *Attorneys for Defendants City of Albuquerque,*
      *Yvonne Martinez, Dennis Tafoya, George Trujillo,*
      *and Lorraine Lopez-Sadler*

Patrick D. Allen
Patricia Padrino
Yenson, Lynn, Allen & Wosick, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Peter Dwyer*